IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JILLIAN C. O'CONNELL,           )
                                )
                  Plaintiff,    )
                                )
          v.                    )     1:21CV929
                                )
KILOLO KIJAKAZI,                )
Acting Commissioner of Social Security, )
                                )
                  Defendant.    )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jillian O'Connell ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on November 16, 2017, alleging a disability onset date of September 15, 2017. (Tr. at 137, 322-39.)[1] Her application was denied initially (Tr. at 110-21, 162-65) and upon reconsideration (Tr. at 122-33, 175-81). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 182-83.) On December 2, 2019, Plaintiff, along with her attorney, attended the subsequent hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at

---
[1] Transcript citations refer to the Sealed Administrative Record [Doc. #6].

137.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 150.) However, on October 23, 2020, the Appeals Council remanded Plaintiff's case in order for the ALJ to consider additional evidence, including opinion evidence from Dr. Daniel Sa. (Tr. at 156-61.) Accordingly, on April 5, 2021, Plaintiff attended a second hearing, this time by telephone, with her attorney and a vocational expert again in attendance. (Tr. at 12.) After this hearing, the ALJ once more determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 31-32), and, on October 13, 2021, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 14.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> rheumatoid arthritis; fibromyalgia; erythromelalgia; tendinosis of peroneal tendons; small left Achilles enthesopathy; osteoarthritis; and Raynaud's disease[.]

(Tr. at 14.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 16-17.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform sedentary work with the following, additional limitations:

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

Case 1:21-cv-00929-CCE-JEP Document 20 Filed 02/08/23 Page 5 of 12

> [Plaintiff] can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; [Plaintiff] can frequently handle and finger bilaterally; she can never be exposed to unprotected heights; and she requires the flexibility to use a cane for walking.

(Tr. at 17-18.) At step four of the analysis, the ALJ determined that Plaintiff's past relevant work did "not require the performance of work-related activities precluded by [her RFC]." (Tr. at 31.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 31.)

Plaintiff now raises two challenges to the ALJ's decision. Specifically, Plaintiff contends that the ALJ erred by (1) failing to properly evaluate the opinion evidence and (2) failing to properly consider Plaintiff's subjective complaints, absenteeism, mental limitations, and reaching, handling, and fingering limitations when assessing her RFC. After a thorough review of the record, the Court agrees that the ALJ failed to adequately consider substantial record evidence of Plaintiff's absenteeism.

Notably, Plaintiff raises the issue of absenteeism in both of her contentions. In challenging the ALJ's treatment of the medical source statement from a treating rheumatologist, Dr. Kinga Vereczkey, Plaintiff notes that the ALJ discounted Dr. Vereczkey's opinion that Plaintiff would likely have "more than one absence per month due to PT [physical therapy], RA [rheumatoid arthritis] treatment infusions, [and] follow up appointments." (Tr. at 2036, 29.) Dr. Vereczkey also opined that Plaintiff "may have absences due to her chronic joint symptoms (pain, swelling, stiffness), RA [rheumatoid arthritis] flares [and being] on immunosuppressive medications with high risks of infections and possible medication side effects." (Tr. at 2036, 29). The ALJ recounted these opinions in her decision but found that

6

"the need for absences and breaks is speculative, and it appears it is based on [Plaintiff's] subjective complaints." (Tr. at 29.) The ALJ discounted the similar opinion of another treating rheumatologist, Dr. Joseph Shanahan, that Plaintiff "would likely be absent from work more than four days a month as a result of her impairments and treatment." (Tr. at 31, 2535.) As with Dr. Vereczkey's opinion, the ALJ ultimately determined that Dr. Shanahan's opinion "appeared to be based mostly on [Plaintiff's] self-report[s]," and that it was "not supported by the objective medical record." (Tr. at 31.)

However, as Plaintiff explains at length with regard to her second contention, her absences both prior to her alleged onset date and throughout the time period at issue are well documented in the record. In fact, "[d]espite significant employer accommodations, [Plaintiff] exhausted her entire 10 weeks of annual and sick leave during her last year on the job." (Pl.'s Br. [Doc. #12] at 20 (citing Tr. at 52)); (see also Tr. at 18) ([Plaintiff] stated that she received disability from her employer in 2016. [She] testified that she exhausted all of her leave and it became harder and harder for her to engage/participate in management meetings, and she was unable to focus); (Tr. at 19) (Plaintiff "was able to work for five years after she was diagnosed [with rheumatoid arthritis], but she went from working full-time in the office to teleworking one-to-three days [per week], and she reconfigured her office space with special lights and monitors. She reported that she missed a lot of work due to her impairments."). Significantly, Plaintiff also provided the Social Security Administration with "a table showing her treatment appointment schedule covering the 7 months from May 1, 2019, through November 30, 2019" which showed "that 22% of what would normally be workdays were interrupted by treatment appointments alone." (Pl.'s Br. at 20 (citing Tr. at 482)). The estimated missed hours just for

7

these treatment appointments in 138 hours, which totals over 17 days; in a 7-month period, that is over two days absent per month. Moreover, Plaintiff's treatment records reflect that she continued to average two or more medical appointments per month after this time:

> [I]n 2020, [Plaintiff] averaged two medical appointments per month. Treatment records show 25 medical visits [between January 13, 2020 and December 28, 2020]. (Tr. at 2117-2473). In the three months of 2021 leading up to the second hearing, [Plaintiff] had 13 medical appointments. (Tr. at 2219-2236, 2476-2522, 2474-2475). [T]hese are only medical appointment days; this does not include the time that [Plaintiff] would miss due to the symptoms of her impairments.

(Pl.'s Br. at 20.)[4] Notably, Plaintiff's treatment for rheumatoid arthritis during the relevant time period included Remicade infusions, consisting of two-hour infusions administered every four or five weeks (Tr. at 23-26, 57) as well as multiple rounds of physical therapy (Tr. at 800-47, 869-907, 1201-14). Despite all of the above evidence, the ALJ did not discuss the impact of Plaintiff's treatments on her ability to work other than to discount Drs. Vereczkey and Shanahan's opinions, and Defendant does not address the issue of absenteeism in her brief. This omission is critical. As the following exchange between the ALJ and the vocational expert illustrates, a finding that Plaintiff would miss two or more days of work per month would not only negate the ALJ's step four finding that Plaintiff could return to her past relevant work; it would also preclude Plaintiff from performing any competitive employment, thereby rendering her disabled under the Act at step five:

> Q If a person were to have two or more absences per month due to symptoms or treatment, would that preclude past relevant work and other competitive employment?
>
> A It would. Absenteeism is not covered in the [Dictionary of Occupational Titles], nor is it covered in the [Select Characteristic of Occupations]. Current

---

[4] The record also reflects approximately 20 medical appointments in 2018, 14 of which involve treatment for Plaintiff's rheumatoid arthritis. (See Tr. at 732-52, 2405-06, 2429-37.)

8

> literature indicates the outside allowance for absenteeism is one day per month.
> Once a person exceeds that they're unable to sustain competitive employment.

(Tr. at 108.)

Social Security guidance makes clear that "[t]he RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p: <u>Policy Interpretation Ruling Titles II And XVI: Assessing Residual Functional Capacity In Initial Claims</u>, 1996 WL 374184, 61 Fed. Reg. 34474, 34477 (July 2, 1996); see <u>Filmore v. Saul</u>, No. 4:18CV1609, 2019 WL 4576300, at *7-8 (E.D. Mo. Sept. 20, 2019) ("The ALJ did not discuss whether the alleged work absences stemming from the IVIG therapy were supported by the record, or why work absences were not included in Filmore's RFC. . . . If the ALJ did not believe Filmore's IVIG treatment would necessarily result in two or more work absences a month, there is no indication of this in his opinion. Because the medical evidence and Filmore's testimony support this degree of absenteeism, at least for the twelve-month period of 2010, the ALJ erred in not discussing this issue. This error is not harmless, as the vocational expert testified that competitive work would be precluded if an individual would consistently miss two or more days of work a month."). "To be clear, the Court is not saying that 'frequency of medical appointments alone' renders a claimant disabled . . . [b]ut the ALJ must still consider the effects of a claimant's treatment in conjunction with the other evidence of record." <u>Kim J. H. v. Saul</u>, No. 18-cv-2736, 2020 WL 872308, at *11 (D. Minn. Jan. 28, 2020) (remanding case based on ALJ's failure to consider absences caused by medical treatment).

9

"It remains Plaintiff's burden to show that the frequency of her treatments is a limitation that should have been accounted for at Step 4 of the sequential analysis." Miller v. Astrue, No. 1:12-cv-16, 2012 WL 6644390, at *10 (S.D. Ohio Dec. 20, 2012). In this case, Plaintiff has presented uncontested evidence—through her testimony, the longitudinal medical treatment records, and the medical opinions of her treating rheumatologists—that treatment of her rheumatoid arthritis included regular infusions, physical therapy, follow-up appointments, and testing that resulted in more than two absences per month. The ALJ simply did not address the resulting limitations from these treatments. See Kim J.H., 2020 WL 872308 at *11. To undertake this analysis in the first instance would usurp the ALJ's role as fact finder. See Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943) (courts must review administrative decisions on the grounds upon which the record discloses the action was based); Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. March 25, 2014). Here, in assessing Plaintiff's RFC, the ALJ did not consider "effects of treatment, including limitations or restrictions imposed by the mechanics of treatment" related to Plaintiff's infusions, physical therapy, and other necessary medical appointments as required by SSR 96-8p. Specifically, the ALJ failed to consider and explain the extent to which Plaintiff's impairments and required treatments, including absences, precluded her ability to work for any twelve-month period during the alleged disability period, given the evidence before her including Plaintiff's testimony, the treatment record, and the specific opinion evidence on this point.

In light of the ALJ's failure to fully consider and explain this issue at step four of the sequential analysis, the Court cannot find that there is substantial evidence to support the

ALJ's decision, and remand is required to allow the ALJ to consider the effect of Plaintiff's treatment and absences on her ability to work. Having reached this conclusion, the Court need not consider Plaintiff's remaining contentions.[5]

---

[5] To the extent the ALJ's error regarding Plaintiff's absenteeism is based on her failure to properly consider the supportability and consistency of the treating rheumatologists' opinions in accordance with 20 C.F.R. § 404.1520c, the ALJ should, and indeed must, address her basis for measuring the persuasiveness of each medical opinion on remand. See 20 C.F.R. § 404.1520c(b); see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness). In other words, §§ 404.1520c(b)–(c) define the "minimum level of articulation" an ALJ must include in her written decision "to provide sufficient rationale for a reviewing . . . court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01. Because the analysis of the opinion evidence will be before the ALJ again on remand, the Court further notes that to the extent the ALJ has rejected the opinion evidence from all of Plaintiff's three treating rheumatologists, Dr. Beall, Dr. Vereczkey, and Dr. Shanahan, who were remarkably consistent in their analysis of Plaintiff's limitations, it appears that the ALJ's analysis is based on several inaccurate assessments of the record that would require further consideration and explanation. For instance, the ALJ appears to rely on her own lay assessment of Plaintiff's physical examinations as "unremarkable" when all of the treating rheumatologists who examined Plaintiff over the course of several years noted various findings including persistent tenderness and concluded that Plaintiff's rheumatoid arthritis resulted in functional limitations significantly more limited than the RFC. It is not clear why or how the ALJ concluded that the examinations were "unremarkable" in contrast to the examiners' own assessments, or whether the ALJ was imposing some specific objective requirement (not shared by the rheumatologists) for limitations related to rheumatoid arthritis. The ALJ also concluded that the treating rheumatologists' opinions were not supported by the examinations because Plaintiff's condition was occasionally listed as "stable," although of course a condition can be stable but at a level of disabling functional limitation. Even more notably, the ALJ relied heavily on a notation by Dr. Vereczkey in May 2019 that Plaintiff's rheumatoid arthritis was in "remission." (Tr. at 23, 27.) However, as Plaintiff explained at both hearings (Tr. at 100-01, 69), this was an erroneous entry apparently as a result of a "cut and paste" error, and Dr. Vereczkey actually corrected the records and deleted any reference to "remission," instead replacing that reference with a notation that Plaintiff "has seropositive, erosive RA – continues with joint p[a]in and swelling – today [] of the left ankle. She has bone spur, Achilles tendonitis, left 5th MTP erosion (correction of previous note)." (Compare Tr. at 857 and 2111; Tr. at 866 and 2099). Dr. Vereczkey also deleted a reference that "seropositive" was "not applicable" (Tr. at 859, 2090) instead confirming Plaintiff's diagnosis of seropositive RA, with blood tests consistently positive for CCP antibodies. Dr. Vereczkey also clarified in the next treatment note in November 2019 that although Plaintiff previously swam and played golf and was active, she was "unable to do all of these d[ue] to her flares" of RA. (Tr. at 1227.) As another example of potentially inaccurate assessments, the ALJ referenced Plaintiff's physical therapy for her hands and fingers, noting that Plaintiff "made advancements toward achieving her goals," and the ALJ adopted an RFC with frequent handling and fingering (Tr. at 22, 18), without addressing the fact that those same physical therapy notes reflect that at the end of the course of physical therapy, Plaintiff was still unable to grasp an object for more than 15 minutes, she was still unable to pick up a dime, she still had severe difficulty manipulating objects, she still had severe difficulty turning or twisting objects, and she still had limited range of motion in her wrists, with only 3/5 strength in her fingers and limited range of motion of her thumb, with only "minor progress" toward meeting her goals. (Tr. at 843, 845.) This assessment was made in early 2019, close in time to Dr. Beall's opinion that Plaintiff had severe limitations in hand range of motion due to pain and diffuse tender points, with a limitation to 0 hours of fine finger movements. (Tr. at 1220-22.) In 2020, Dr. Shanahan noted that Plaintiff "remains profoundly disabled because of the chronic pain issues and stiffness"

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claim in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #14] should be DENIED, and Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. #11] should be GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 8th day of February, 2023.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

and "[h]er quality of life remains poor" (Tr. at 2527), with an opinion shortly thereafter (not addressed by the ALJ) limiting her to 0 hours fine finger movements (Tr. at 558). As another example regarding the opinion evidence, the ALJ rejected the opinion of neurologist Dr. Sa, who limited Plaintiff to part-time work, and in doing so the ALJ stated that Plaintiff had "normal physical examinations" with "no evidence [she] has peripheral neuropathy." (Tr. at 30.) However, Dr. Sa's analysis was based on review of the records of Plaintiff's treating neurologist Dr. Lin, who noted on physical examination "decreased stocking" sensation to pin, with "sensory changes, weakness and skin color changes in her feet" (Tr. at 911-12), and after EMG testing an Impression of "Periph Neuropathy unspec" due to erythromelalgia (Tr. at 916.) According to the National Institutes of Health, "Erythromelalgia is often considered a form of peripheral neuropathy because it affects the peripheral nervous system, which connects the brain and spinal cord to muscles and to cells that detect sensations such as touch, smell, and pain." https://medlineplus.gov/genetics/condition/erythromelalgia. The ALJ included erythromelalgia as a severe impairment but then failed to reconcile that with the rejection of Dr. Sa's opinion. Finally, the Court notes that Plaintiff was a federal employee, and after she stopped working she was approved for long term disability by the Office of Personnel Management based on her inability to perform her "own occupation" based on the opinions and records from her rheumatologist Dr. Beall, and she was later approved for long terms disability from her "own occupation" and "any occupation" based on Dr. Sa's opinion and the opinions of the subsequent treating rheumatologists Dr. Verecskey and Dr. Shanahan. It is not clear why these opinions were relied upon by OPM but rejected by the ALJ. Given these various issues related to the opinion evidence, it appears that remand would also be necessary related to the ALJ's evaluation of the opinion evidence, and these issues can be further considered and addressed on remand.